**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0244n.06
Filed: May 7, 2008

**No. 07-1674**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| Alando Barry, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Noble Metal Processing, Inc., | ) | **O P I N I O N** |
| | ) | |
| Defendant-Appellee. | ) | |

**BEFORE: GILMAN, ROGERS, and McKEAGUE, Circuit Judges.**

**McKEAGUE, Circuit Judge.** In August of 2004, Alando Barry ("Plaintiff"), an African-American male, was terminated from his employment as a forklift operator with Defendant, Noble Metal Processing, Inc. ("NMP"). According to NMP, Plaintiff was terminated for violating the company's workplace violence policy by assaulting a supervisor. Based on his belief that NMP actually terminated him because of his race, Plaintiff filed suit in federal court alleging race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., along with various state law claims. In a ruling from the bench, the district court granted full summary judgment for NMP. Plaintiff timely appealed the district court's decision on the Title VII claim only. For the reasons stated below, we **AFFIRM** the decision of the district court.

**I. BACKGROUND**

On August 15, 2004, Plaintiff, a forklift operator, reported to his assigned work station in Area 2 of the NMP facility. Upon arriving at his work station, Plaintiff noticed that he had not been

provided with a key to one of the four heavy-duty forklifts referred to around the shop as a "Big Red." Because a Big Red was necessary to lift the heavy loads that Plaintiff was required to move throughout Area 2, he drove a smaller forklift out of Area 2 and into Area 1 in search of a Big Red. Upon his arrival in Area 1, Plaintiff witnessed one of his co-workers, Ken West, who is also African-American, sitting on a Big Red. Plaintiff proceeded to angrily confront West regarding his use of a Big Red, which—according to Plaintiff—West's job assignment did not require. A verbal altercation ensued between the two men about whose turn it was to use a Big Red. Concerned that the war of words between West and Plaintiff was on the verge of becoming physical, Linda Kolleda, a white female and the Area 1 supervisor, attempted to intervene.[1]

Exactly what happened next differs depending on which individual is recounting the events. According to Kolleda, Plaintiff placed his hands on her shoulder and "pulled me back abruptly" while saying "excuse me." Kolleda Dep. at 66. Kolleda indicated in her deposition that the force applied to her shoulder caused her to stagger several steps backward. Kolleda further testified that the altercation ended with Plaintiff's informing West in a threatening manner that "he took care of

---

[1]At the time of the incident in question, Plaintiff did not report to Kolleda because he was assigned to Area 2. However, Kolleda had supervised Plaintiff several years before. During her time as Plaintiff's supervisor, the two had a disagreement over a write-up that Kolleda had issued to Plaintiff. Plaintiff complained to Kolleda's supervisor, who ripped up the document and explained to Kolleda that such a disciplinary action was unwarranted. Plaintiff alleges that Kolleda held a grudge against him because she was embarrassed by the incident, and her claim that Plaintiff violated the workplace violence policy was revenge for the prior disagreement. It appears from the record that after the write-up incident, Plaintiff moved to Area 2 and had no contact with Kolleda until the altercation with West approximately two years later.

all his business in the parking lot." Kolleda Dep. at 68. Although the incident scared Kolleda, she did not contact the police or NMP security.

Perhaps unsurprisingly, Plaintiff tells a somewhat different story. According to his deposition testimony, when Kolleda attempted to intervene, he merely "touched" her on the shoulder as if to say "excuse me." Barry Dep. at 141. Plaintiff denied having pulled Kolleda out of the way by her shoulder or otherwise exerting any force on her person. In Plaintiff's opinion, Kolleda has exaggerated the incident because she has a vendetta against him. When interviewed by Human Resources personnel about the event, West indicated that he did not see Plaintiff push Kolleda. West further stated that he never felt threatened by Plaintiff, and the two men later placed the altercation behind them by shaking hands.

Following the altercation, Kolleda filed an incident report with NMP's Human Resources Department. The report alleged that Plaintiff's conduct violated NMP's workplace violence policy. Upon receiving the incident report, Michelle Verkerkee, then-NMP Human Resources Manager, commenced an investigation into Kolleda's allegations. After briefly speaking with Plaintiff about the situation, Verkerkee suspended him pending further investigation. During her investigation, Verkerkee spoke with Plaintiff, West, and Kolleda. She also consulted with Tom Davenport, NMP's Vice President of Human Resources, as well as Brian Bickimer, NMP's Plant Manager. At the conclusion of her investigation, Verkerkee determined that Plaintiff had violated the workplace violence policy. As a result—with Davenport's blessing—she terminated Plaintiff's employment effective August 17, 2004.

Plaintiff then filed a grievance, alleging that he was terminated without cause in violation of the collective bargaining agreement entered into between Plaintiff's union and NMP. The grievance proceeded to arbitration. Following a full-fledged arbitration hearing, the arbitrator held that Plaintiff had violated the workplace violence policy, and the violation was cause for termination under the collective bargaining agreement. After having his grievance denied, Plaintiff received his EEOC right to sue letter and commenced this Title VII action.

Upon the completion of discovery, NMP moved for summary judgment on all of Plaintiff's claims. The district court held a hearing on NMP's motion. At the conclusion of the hearing, the district court granted NMP summary judgment on all of Plaintiff's claims in a ruling from the bench. Applying the burden-shifting analysis announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the district court expressed doubt as to whether Plaintiff had established a prima facie case of discrimination. But, it reasoned that even if the elements of the prima facie case had been proven, Plaintiff's Title VII claim failed because there was no evidence that his violation of the workplace violence policy on which NMP based its termination decision was merely a pretext for race discrimination.[2]

## II. ANALYSIS

### A. Standard of Review and Summary Judgment Standard

This court reviews a district court's grant of summary judgment de novo. *Nichols v. Moore*, 477 F.3d 396, 398 (6th Cir. 2007). At the summary judgment stage, the district court must construe

---

[2]Plaintiff's brief contains no argument regarding his state-law claims; therefore, the only issue properly before this court is whether the district court erred in granting summary judgment for NMP on Plaintiff's Title VII claim.

the evidence and draw all reasonable inferences in favor of the nonmoving party. *Jones v. Potter*,

488 F.3d 397, 403 (6th Cir. 2007). The mere allegation of a factual dispute is insufficient to "defeat

an otherwise properly supported motion for summary judgment; the dispute must present a *genuine*

issue of *material* fact." *Henderson v. Walled Lake Consol. Schs.*, 469 F.3d 479, 487 (6th Cir. 2006).

A "genuine" dispute is one that would permit a reasonable jury to return a verdict in favor of the

nonmoving party, and a fact is "material" only if its resolution could affect the outcome of the

litigation under the applicable law. *Id*.

**B. Discussion of Plaintiff's Title VII Claim**

A plaintiff may prove that he was subject to disparate treatment based on race in violation

of Title VII by way of either direct or circumstantial evidence. *Clay v. United Parcel Serv., Inc.*, 501

F.3d 695, 703 (6th Cir. 2007). In cases—like that currently before this court—where there is no

direct evidence of discrimination, the plaintiff's circumstantial evidence must be presented via the

burden-shifting framework established by the Supreme Court in *McDonnell Douglas*. *See Michael*

*v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007). Under *McDonnell Douglas*, the

plaintiff must first prove a prima facie case of discrimination. *Texas Dept. of Cmty. Affairs v.*

*Burdine*, 450 U.S. 248, 252-53 (1981). If the plaintiff succeeds in establishing a prima facie case,

the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the

action taken against the plaintiff. *Id*. at 253. Should the defendant be able to offer a legitimate,

nondiscriminatory reason, the burden shifts back to the plaintiff to prove by a preponderance of the

evidence that the defendant's offered justification was merely a pretext for unlawful discrimination.

*Id*.

In the current case, Plaintiff argues that he has established a prima facie case and that NMP's legitimate, nondiscriminatory reason—his violation of the workplace violence policy—was a pretext for racial discrimination. NMP first argues that summary judgment was properly granted because Plaintiff has failed to make out a prima facie case. It further states that even if a prima facie case has been established, Plaintiff's claim lacks merit because there is no evidence that his violation of NMP's workplace violence policy was a pretext for race discrimination.

To establish a prima facie case of discrimination, a plaintiff must prove by a preponderance of the evidence that: (1) he is a member of a protected class; (2) he was subject to an adverse employment action; (3) he was qualified for the position; and (4) a similarly situated person outside of the protected class was treated more favorably. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992). There is no debate in this case that Plaintiff has satisfied the first three requirements of a prima facie case. The parties, however, vigorously dispute whether Plaintiff has established that NMP treated a similarly situated Caucasian more favorably.[3]

To satisfy the similarly situated requirement, a plaintiff must show that the comparable employee is similar "in all of the *relevant* aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (internal quotation marks omitted). In announcing the "all of the relevant aspects" standard, *Ercegovich* narrowed this court's prior holding in *Mitchell*, which had

---

[3]While the district court recognized the dispute regarding the similarly situated requirement, it elected to assume *arguendo* that a similarly situated Caucasian employee was treated differently and proceeded to grant summary judgment for NMP on the ground that Plaintiff could not establish pretext. Because this court can affirm a district court's summary judgment decision on any grounds supported by the record, even if different than those relied on by the district court, we find it proper to first consider whether Plaintiff has established a prima facie case. *See Jones*, 488 F.3d at 404.

required that the plaintiff and the comparable employee be "similarly situated in *all respects*." *Id*.;

*see also Clayton v. Meijer, Inc.*, 281 F.3d 605, 610-11 (6th Cir. 2002) (recognizing that *Ercegovich*

modified the analysis set forth by the *Mitchell* court). While the precise aspects of employment that

are relevant to determining whether the similarly situated requirement has been satisfied depend on

the facts and circumstances of each case, this court has generally focused on whether the plaintiff

and the comparable employee: (1) share the same supervisor; (2) are subject to the same standards;

and (3) have engaged in the same conduct "without such differentiating or mitigating circumstances

that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154

F.3d at 352 (internal quotation marks omitted).

### 1. Same Supervisor

The determination of whether two employees shared the same supervisor is made on a case-

by-case basis and does not depend entirely on whether the two shared the same immediate

supervisor. *See McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005). Rather, this court has

determined that in many instances the term "supervisor" should be construed broadly to include

cases where both employees' situations were handled by the same "ultimate decision-maker." *Id*.

In *McMillan*, the plaintiff claimed that the district court erred by instructing the jury that to be

similarly situated the comparable employee "must have dealt with the same supervisor." *Id*. at 413-

14. According to the plaintiff in *McMillan*, the instruction erroneously implied that two employees

who did not share the same immediate supervisor—but did share the same ultimate decision-maker

and were subject to employment decisions issued by that individual—could not be similarly situated.

*Id*. at 413-14.

Rejecting this argument, the *McMillan* court explained that the jury could have reasonably concluded that the term "supervisor" encompassed those individuals who ultimately determined what employment actions would be taken against the plaintiff and the comparable employee. *Id*. at 414; *see also Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 459 (6th Cir. 2003) (stating that the "same supervisor" analysis is focused less on whether the comparable employee shared the same immediate supervisor as the plaintiff and more on whether the individual who ultimately meted out the discipline to both individuals was the same). Thus, under *McMillan* and *Seay*, two employees who are directly supervised by different individuals are not necessarily dissimilar if the same member of management disciplined both the plaintiff and the comparable employee.

This court has previously held that a plaintiff and a comparable employee are not similarly situated where they were disciplined by different ultimate decision-makers. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 762-63 (6th Cir. 2000). In *Smith*, the plaintiff claimed that his former employer discriminated against him on the basis of race in violation of a state statute that mirrored Title VII in all respects. *Id*. at 758. Applying Title VII case law and principles to the plaintiff's complaint, this court in *Smith* determined that the non-minority employees that he claimed received preferential treatment "were not similarly situated as a matter of law." *Id*. at 763. The *Smith* court reasoned that the comparable employees were not similarly situated in part because they were disciplined by a different decision-maker than was the plaintiff. *Id*. at 762. In fact, the individual who disciplined the comparable employees was no longer employed by the defendant when the decision was made to terminate Smith. *Id*. at 763.

In this case, Plaintiff argues that he is similarly situated to a Caucasian employee named Pete Duncan, who Plaintiff says violated NMP's workplace violence policy in 2003, but was not subject to termination. According to Plaintiff, Duncan was involved in a workplace altercation with another NMP employee, Charles Brown. The impetus for the altercation was Brown's apparent romantic interest in a female co-worker who had previously dated Duncan. As Plaintiff recounts the Duncan-Brown incident, Duncan shoved and threatened Brown while the two were on the clock at NMP. *Id*. Following the altercation, Brown lodged a complaint with NMP's Human Resources Department. *Id*. NMP then conducted an investigation and Duncan was disciplined, but not terminated.[4] *Id*. In Plaintiff's opinion, this information is sufficient to establish that Plaintiff and Duncan were similarly situated.

Unfortunately for Plaintiff, there are critical differences between the Duncan-Brown incident and Plaintiff's assault of Kolleda that are fatal to Plaintiff's claim when considered in light of the legal standards set forth above. First, like the plaintiff and the comparable employees in *Smith*, Plaintiff and Duncan shared neither the same immediate supervisor nor were their disciplinary matters handled by the same ultimate decision-maker. At the time of the incident involving Brown, Duncan himself was employed by NMP as a supervisor, whereas at the time of the altercation with

---

[4]At oral argument, Plaintiff's counsel repeatedly stated that NMP failed to follow its own zero tolerance workplace violence policy because Duncan was issued a warning instead of being terminated as the policy requires. A review of the record, however, illustrates that a violation of the policy need not result in termination. NMP's policy provides that any employee who engages in workplace violence "will be disciplined, *up to and including termination*." NMP 2004 Bargaining Unit Associate Handbook at 16 (emphasis added). Thus, Plaintiff's assertion that NMP's policy requires termination, and the company's failure to terminate Duncan indicates that the policy was selectively enforced against Plaintiff, lacks merit.

Kolleda and West, Plaintiff was not employed in a supervisory capacity. Based on this difference in their status, there is no argument to be made that Plaintiff and Duncan shared the same immediate supervisor; Plaintiff's immediate supervisor would have been a person of the same rank as Duncan. In essence, it is Plaintiff's position that he and Duncan shared the same supervisor because both incidents were handled by NMP's Vice President of Human Resources, Tom Davenport. This argument finds no support in the record.

The allegations lodged against Plaintiff were investigated by NMP's Human Resources Manager, Michelle Verkerkee, who ultimately determined, in consultation with Davenport, that termination was warranted. During her deposition, Verkerkee indicated that she was on maternity leave at the time of the Duncan-Brown incident and had no involvement in the resolution of that matter. Given her absence, Verkerkee testified that the Duncan-Brown incident had been addressed by Human Resources Staffing Specialist, Rayana Mariland, without any input from Verkerkee. Additionally, the record indicates that Davenport was also entirely oblivious to the handling of the Duncan-Brown incident. In fact, Davenport testified in his deposition that he was unaware of the incident until it was raised by Plaintiff in this case. He further testified that as an NMP Vice President, he would not have been advised of the Duncan-Brown altercation because "there would be no reason for the plant HR person to bring a verbal warning to my attention." Davenport Dep. at 18.

As the record bears out, Verkerkee and, to a lesser extent, Davenport were the individuals responsible for terminating Plaintiff. Considering the evidence in the light most favorable to Plaintiff, there is not even a scintilla of evidence that either of those individuals had any involvement

in the handling of the Duncan-Brown incident. There is also no evidence that Rayana Mariland or any of the other individuals involved in the resolution of the Duncan-Brown incident participated in the decision to terminate Plaintiff. Accordingly, Plaintiff has failed to produce any evidence from a which a reasonable jury could conclude that he and Duncan shared the same supervisor.

### 2. Same Standards

There is no dispute in this case that Plaintiff and Duncan, as employees of NMP, were both governed by the same NMP workplace violence policy. Thus, they were both subject to the same standards of conduct during their employment with NMP and further analysis is not necessary regarding this factor.

### 3. Same Conduct

In order for the conduct of a comparable employee and the Title VII plaintiff to be considered the "same conduct," it must be similar in kind and severity. *See Meijer*, 281 F.3d at 611. The plaintiff in *Meijer*, an African-American truck-driver, was terminated for violating a company safety policy regarding the proper way to drive a truck away from a loading dock. *Id*. at 607. As a result of the plaintiff's failure to follow Meijer's company policy, a dockworker who was loading the truck suffered severe injuries. *Id*. at 608. Claiming that he was terminated based on his race and not his violation of company policy, the plaintiff filed a Title VII action against Meijer. *Id*. at 607.

Attempting to establish a prima facie case, the plaintiff in *Meijer* argued that several Caucasian truck-drivers were not terminated for violations of the same company safety policy. *Id*. at 610. This court rejected the plaintiff's argument, holding that the Caucasian truck drivers who violated the same safety policy were not similarly situated because their conduct did not result in

serious harm to another individual. *Id*. at 611. In the words of the *Meijer* court, when meting out discipline an "employer is not precluded from considering the harm resulting from the conduct of its employees." *Id*. at 612.

Similarly, in *Smith* this court explained that comparable employees were not similarly situated with the plaintiff because—in addition to being disciplined by different decision-makers as previously discussed—the plaintiff's conduct was more egregious than that of the comparable employees. *Smith*, 220 F.3d at 763. The court stressed that Smith's threat to "blow away some MFers" at the plant was more serious than the threats leveled by the comparable employees who received lesser forms of discipline. *Id*.; *see also Braithwaite v. Timken Co.*, 258 F.3d 488, 497 (6th Cir. 2001) (explaining that the plaintiff was not similarly situated to comparable employees who were not terminated because his conduct amounted to a more serious violation).

Here, as with the plaintiffs' attempts to establish that the comparable employees in *Meijer* and *Smith* were similarly situated, Plaintiff's conduct was more serious than that engaged in by Duncan. In this case—accepting Plaintiff's recollection of the incident as true—he placed his hands on Kolleda, an NMP supervisor, as she attempted to intervene in an altercation that Plaintiff had initiated with West. This physical touching of Kolleda during a heated altercation in the workplace could clearly be considered a violation of the NMP workplace violence policy.

While it appears from the record that Duncan "nudged" Brown in a manner similar to the way Plaintiff describes his contact with Kolleda, like the conduct involved in *Meijer* and *Smith*, Plaintiff's conduct was more severe than that engaged in by Duncan. Whereas Duncan assaulted a fellow employee with whom he was having an argument, Plaintiff put hands on an uninvolved supervisor

who attempted to dispel the situation between him and West. There is a marked difference in the workplace setting between nudging a co-worker with whom you are engaged in a heated discussion and physically interfering with a supervisor who—in the performance of her duties—attempts to intervene in an argument involving one of her subordinates. This difference in the severity of the conduct between Plaintiff and Duncan leads this court to conclude that no reasonable jury could find that their conduct was the "same conduct" for purposes of the similarly situated analysis.

Looking to the factors that this court examines to determine whether a plaintiff has established that a similarly situated non-minority employee received more favorable treatment, particularly the difference in supervisors, Plaintiff has failed to adduce evidence from a which a reasonable jury could conclude that he and Duncan were similarly situated. Therefore, Plaintiff has not established the fourth element of his prima facie case, and summary judgment was properly granted for NMP.[5]

## C. Plaintiff's Argument Regarding the District Court's Reliance on the Arbitrator's Decision

At the conclusion of his brief, Plaintiff cursorily argues that the district court erroneously held that his Title VII claim was barred by the arbitrator's resolution of his grievance, in contravention of *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974). While Plaintiff is correct that the Supreme Court did hold in *Alexander* that an arbitration proceeding regarding an employee's termination does not preclude the employee from later bringing a Title VII action, no such thing

---

[5]Having concluded that Plaintiff has failed to establish a prima facie case, it is not necessary for this court to determine whether the legitimate, non-discriminatory reason for the termination was a mere pretext for discrimination. We wish to note, however, that even were we to find a prima facie case, Plaintiff has failed to produce any evidence of pretext; there is simply no evidence suggesting that Plaintiff's termination was racially motivated.

occurred in this case.  The district court's ruling on Plaintiff's Title VII claim did not rely on the arbitrator's denial of Plaintiff's grievance in any way.  In granting summary judgment for NMP on Plaintiff's Title VII claim, the district court conducted a proper analysis under *McDonnell Douglas* and determined that no reasonable jury could conclude that Plaintiff was terminated because of his race.  Plaintiff's argument that the district court found that his Title VII claim was barred by the arbitrator's decision is completely devoid of merit and does not warrant further discussion.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment for NMP.